**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

| | | |
|---|---|---|
| MICHAEL PARKS<br>7372 Bent Grass Drive<br>Winter Haven, FL 33884 | ) | Case No. 1:26-cv-00863-LMB-WEF |
| DR. SUKEENA STEPHENS<br>24 Wild Rose Drive<br>Fredericksburg, VA 22406 | ) | **CLASS ACTION** |
| FREEMAN JORDAN<br>1860 Vista Dr.<br>Wilmington, IL 60481 | ) | JURY TRIAL DEMANDED |
| On behalf of Themselves<br>And Those Similarly Situated, | ) | SECOND AMENDED COMPLAINT |
| and | ) | |
| CHAD SUTTON<br>2259 Sutton Cliff Ave.<br>Henderson, NV 89052 | ) | |
| On his own Behalf, | ) | |
| *Plaintiffs*, | ) | |
| v. | ) | |
| MARKWAYNE MULLIN,<br>Secretary of the Department<br>of Homeland Security, | ) | |
| In his Official Capacity | ) | |
| <u>Serve:</u><br>Department of Homeland Security<br>2707 MLK Jr. Ave. SE<br>Washington, DC 20528 | ) | |
| Federal Air Marshals Service<br>6595 Springfield Center Dr.<br>Springfield, VA 22150 | ) | |
| Office of the United States | ) | |

Attorney )
57 Pennsylvania Ave. NW )
Washington, DC 20530 )
)
Department of Justice )
950 Pennsylvania Ave. NW )
Washington, DC 20530 )
)
*Defendant.* )
_______________________________ )

**SECOND AMENDED COMPLAINT**
**FOR INJUNCTIVE AND COMPENSATORY RELIEF**

Plaintiffs, Michael Parks ("Plaintiff Parks"), Dr. Sukeena Stephens ("Plaintiff Stephens") and Freeman Jordan ("Plaintiff Jordan"), by and through undersigned counsel, pursue this action on their own behalf and on behalf of those similarly situated. Plaintiff Chad Sutton ("Plaintiff Sutton") pursues this action individually on his own behalf. The respective Plaintiffs hereby allege as follows:

## I. INTRODUCTION

1. Plaintiffs Parks, Stephens and Jordan represent a group of long-tenured African American Transportation Security Administration (hereinafter "TSA") employees, who are part of the Federal Air Marshals Service (hereinafter "FAMS"). They bring this action alleging that they and the putative Class have been victims of an ongoing pattern, practice, and culture of race discrimination in denying qualified African American air marshals promotional opportunities, particularly with respect to upper management positions. At TSA, promotional decisions of Federal Air Marshals are ultimately made by a small group of executive FAMS leaders at FAMS Headquarters, who are almost exclusively white men. Despite paying lip service to wanting diversity in the force, when it comes to upper management positions, FAMS cherry picks favorites to be promoted, and relies on arbitrary decision-making to foreclose promotions from African

American air marshals who are qualified for advancement. Instead of being a meritocracy, TSA and FAMS top brass is a frat club, where decision-makers choose who they would like to join the club.

2. TSA relies on its selection policies, and that promotional opportunities are scattered across the country, to hide the reality that actual decision-making is centralized, and controlled by a small group of people who delegate only enough authority to create a façade of impartiality in promotion decisions. This process, brought over from the discriminatory practices of the United States Secret Service ("Secret Service") by TSA and FAMS leadership who themselves came from the Secret Service, has worked for years to foreclose qualified African American agents promotion to the agency's leadership ranks, and will only be stopped with intercession of this Court. For the reasons outlined herein, Defendant has violated Title VII of the Civil Rights Act of 1967, 42 U.S.C. § 2000e, et seq., in creating disparate terms and conditions of employment for African Americans FAMS employees, and in denying them equal promotional opportunities as compared to white agents at FAMS.

3. Plaintiff Sutton filed individual and class EEO complaints similarly alleging race discrimination for Defendant's failure to grant him a promotion. For reasons stated herein, he has fully exhausted his individual EEO complaint and his individual claims are timely due to the filing of the original complaint in this action filed November 29, 2023.

## II. JURISDICTION AND VENUE

4. This Court has jurisdiction pursuant to the federal antidiscrimination statute asserted herein. Further, this Court has jurisdiction over this Second Amended Complaint because there is diversity of the parties and presents a question of federal law. 28 U.S.C. §§ 1331 (federal question) and 1332 (diversity).

5. Venue properly lies within this Court pursuant to 28 U.S.C. § 1391, 42 U.S.C. § 2000e-

5(f)(3). Secretary Mullin, as Secretary for the U.S. Department of Homeland Security, is headquartered within the District of Columbia, however the headquarters of the Transportation Security Administration, which contains the FAMS, is located in Virginia. Because this is a class action, Plaintiffs and the putative Class live and worked for Defendant in locations throughout the United States, the jurisdiction of the headquarters of the agency is a proper venue for all Title VII claims. As alleged herein, promotion decisions are ultimately made by a small group of executive FAMS leaders at FAMS Headquarters in Virginia.

## III. PARTIES

6. Plaintiff Michael Parks is an African American male, and resident of the state of Florida. As described in more detail below, Plaintiff Parks began employment with FAMS in February of 2002, joining the Atlanta field office. He retired from FAMS in November of 2023. During his employment, he applied for at least 50 K Band positions and was denied them all.

7. Plaintiff Dr. Sukeena Stephens is an African American female, and resident of the Commonwealth of Virginia. As described in more detail below, Plaintiff Stephens began employment with FAMS in June of 2002 in the New York office. During her career at FAMS, she has applied for nearly 25 K Band positions and was denied them all.

8. Plaintiff Freeman Jordan is an African American male, and resident of the state of Illinois. As described in more detail below, Plaintiff Jordan began employment with FAMS in November of 2001 in the Detroit field office. He retired from FAMS in June of 2022. During his employment at FAMS, he applied for 7 TSES positions, and was denied them all.

9. Plaintiff Chad Sutton is an African American male, and resident of the state of Nevada. As described in more detail below, Plaintiff Sutton began employment with FAMS in July of 2002 as an Air Marshal out of the New York office. He retired from FAMS in July of 2022. During his employment, he applied for more than 15 K Band positions, and was denied them all.

10. Defendant Markwayne Mullin is the Secretary, U.S. Department of Homeland Security (hereinafter "DHS"), and is the agency head for the DHS, including its directorates, sub-agencies and divisions. Defendant has direct authority over and the final responsibility for the Federal Air Marshal Service. He is sued here in his official capacity.

11. Defendant is subject to suit for the negligent, discriminatory, wanton, willful or wrongful acts and/or omissions of employees or agents of Defendant; in addition, Defendant is the employer of persons who have committed negligent, discriminatory acts and/or omission against Plaintiffs and the Class within the course and scope of their employment. Therefore, Defendant is liable pursuant to the doctrine of *respondeat superior*.

## IV. FACTS

### A. CREATION OF THE TSA

12. After the terrorist attacks of September 11, 2001, Congress enacted the Aviation and Transportation Security Act, Pub. L. 107-71 (Nov. 19, 2001), (ATSA). ATSA established the Transportation Security Administration (TSA) within the Department of Transportation (Transportation) to oversee transportation security in aviation and other modes of transportation.

13. Under the Homeland Security Act of 2002, Pub. L. 107–296 (Nov. 25, 2002), TSA was transferred from Transportation to DHS.

14. Every day, at about 450 domestic airports, TSA Transportation Security Officers conduct checkpoint security screening of more than two million passengers for prohibited items such as firearms and improvised explosive devices.

15. The TSA is headed by an Administrator, who is appointed by the President with the advice and consent of the Senate.

16. The TSA Administrator has broad authority regarding personnel management under ATSA, as delegated to the Administrator by the Secretary of Homeland Security. *See* Delegation to the

Administrator of the Transportation Security Administration, Delegation No. 7060.2 (Nov. 5, 2003).

17. The Administrator is authorized to appoint, transfer, and fix the compensation of such officers and employees as may be necessary to carry out the functions of the Administration.

18. The TSA Transportation Security Executive Service (TSES) consists of TSA's executive-level staff who serve in key agency positions just below political appointees.

19. For positions below TSES, TSA uses an "SV" grading system, which is a pay banding system of grades that roughly correlate to GS grades 4-15. The SV grades, identified by letters A-M, have minimum and maximum pay rates, with M being the highest paid band.

20. In June 2010, John Pistole, former Deputy Director of the Federal Bureau of Investigation, was appointed TSA Administrator. That same year, Administrator Pistole created an Office of Professional Responsibility (OPR) through an internal management directive in order to provide greater consistency in misconduct penalty determinations around the country and a more expedient and standardized adjudication process.

21. On December 31, 2014, Administrator Pistole retired from Federal service. Thereafter, TSA Deputy Administrator ("DA") Melvin J. Carraway was designated Acting TSA Administrator. Mark O. Hatfield, Jr. assumed the responsibilities of Deputy Administrator.

**B. <u>THE FEDERAL AIR MARSHALS SERVICE</u>**

22. In response to a number of brazen and deadly airplane hijackings in the early 1960s, the U.S. government formed the Federal Air Marshal Service ("FAMS") in 1961.

23. The program deployed a small number of law enforcement officers to protect flights deemed to be at high risk of hijacking.

24. After the terrorist attacks of 9/11, President George W. Bush ordered a dramatic expansion of the FAMS as part of the government's counter-terrorism efforts.

25. While only 33 air marshals worked on U.S. flights at the time of the attacks, today the Department of Homeland Security's TSA employs thousands of air marshals charged with keeping flight crews and passengers safe while aboard civil aircraft.

26. These highly trained law enforcement officers play a vital role in the TSA's comprehensive approach to addressing evolving threats in civil aviation. These threats can include terrorist activities carried out by lone wolves and nonstate actors, human trafficking and narcotics smuggling, among others.

27. A unique entity within the world of law enforcement, FAMS trains its members to work undercover, blending in with passengers aboard commercial aircraft. Air marshals scan for potential threats using investigative techniques and their knowledge of criminal and terrorist behavior.

28. To avoid tipping off terrorists and other bad actors, air marshals maintain anonymity and use cover stories while traveling back and forth between international and U.S. cities and ports.

29. Air marshals may also conduct investigative work on the ground to prevent terrorism. This often involves working alongside FBI Joint Terrorism Task Forces and other law enforcement agencies.

30. Common federal air marshal duties include:

- Executing arrest warrants
- Assessing flight environments and passenger behavior
- Responding to emergencies and criminal activities occurring during flights
- Serving as witnesses in court
- Using close-quarters self-defense techniques and firearms to protect themselves and other passengers
- Investigating suspicious activities related to aviation
- Arresting passengers who commit crimes aboard flights

31. Unlike many other federal agencies, TSA and FAMS are considered "Excepted Services" and are not subject to the OPM [Office of Personnel Management] standards set out in Title 5 of the U.S. Code, for competitive services or Senior Executive Services. This means that the well-

known federal employee promotional processes are not applicable to TSA and FAMS, and these agencies essentially implement their own promotional processes.

## C. CURRENT MANAGEMENT STRUCTURE OF THE TSA AND FAMS

32. Defendant Markwayne Mullin is the current Secretary of Homeland Security. Secretary Mullin was appointed by President Donald Trump and sworn in on March 24, 2026.

33. Prior to serving in his current role, Defendant served as a United States Senator from the state of Oklahoma.

34. The Administrator of the TSA reports directly to the Secretary of the DHS. Currently, the TSA Administrator is David Pekoske (hereinafter "Administrator Pekoske"). Administrator Pekoske was appointed in August of 2017 by Donald Trump.

35. From approximately August 11, 2019, to November 13, 2019, and again from January 20, 2021, to February 2, 2021, Administrator Pekoske served in a dual role as TSA Administrator and acting Secretary of the DHS.

36. Administrator Pekoske has long been known to be involved in the promotion selection process alleged here that is based on his friendships, sexism, discrimination and favoritism, resulting in a process that overwhelmingly selects white males for promotion to the detriment of higher qualified African American FAMS agents.

37. The TSA Administrator is supported by a Deputy Administrator and several Deputy Assistant Administrators who run various aspects of the agency's operations. The Executive Assistant Administrator for Law Enforcement is also the Executive Director of FAMS, and the terms "Director" and "Executive Assistant Administrator" are used interchangeably.

38. Between October 2018 and 2020, the Executive Assistant to the Administrator (EAA) was David Kohl (hereinafter "Mr. Kohl"). Mr. Kohl was once a Capitol police officer in Washington D.C. and was promoted to EAA for FAMS in 2018 by Administrator Pekoske. Mr. Kohl was

promoted while being actively investigated for discrimination at FAMS' Chicago field office.

39. Until August of 2023, the Executive Director of FAMS was Michael Ondocin (hereinafter "Mr. Ondocin"). Mr. Ondocin, who was once a police officer with the NYPD, was promoted to Executive Assistant Administrator for FAMS in 2018, after having served as the Supervisory Air Marshal in Charge (SAC) of the Boston field office.

40. On or about August 14, 2023, Brian Belcher was elevated to acting Executive Assistant Administrator for Law Enforcement, and is now FAMS' Executive Assistant Administrator/Director for the Law Enforcement.

41. FAMS uses the following rank nomenclature, introduced in 2011:

- Director/Executive Assistant Administrator
- Deputy Director
- Assistant Director/Deputy Executive Assistant Administrator
- Deputy Assistant Director
- Supervisory Air Marshal in Charge (SAC)
- Deputy Supervisory Air Marshal in Charge (DSAC)
- Assistant Supervisory Air Marshal in Charge (ASAC)
- Supervisory Federal Air Marshal (SFAM)
- Senior Federal Air Marshal
- Federal Air Marshal (FAM)

42. FAMS has field offices located in or near the following cities: Atlanta, Baltimore, Boston, Charlotte, Chicago, Dallas, Denver, Detroit, Houston, Las Vegas, Los Angeles, Miami, Minneapolis, Newark, New York, Orlando, Philadelphia, San Francisco, Seattle and Washington, D.C.

43. FAMS has a training facility in Atlantic City, New Jersey, where there are also multiple SACs.

44. Positions at FAMS are referred to as being in "bands" for pay and supervisory authority. Bands are given a letter in the alphabet, and the higher the job and responsibility, the higher the band. The highest band is the "K" Band. The lowest band is the "G" Band.

45. "K" Band jobs are considered senior management that oversee "J" Band, or supervisory positions.

46. Importantly, there is a different selection process for jobs at lower levels than for senior management positions.

47. At the G through I Bands, promotions are based on time in rank, with promotions typically occurring after one year at a pay grade.

48. Once an agent reaches the J Band, promotions are ostensibly based on interviews and the recommendation of the SAC under which the applicant works. However, at that level and above, promotional decisions are almost entirely subjective and are ultimately selected by a small group of executive level FAMS and/or TSA leaders in the agency's Headquarters.

49. The TSA Transportation Security Executive Service (TSES) consists of TSA's executive-level staff who serve in key agency positions just below political appointees, including Supervisory Air Marshal in Charge (SAC) positions and FAMS Deputy Executive Assistant/Director and Executive Assistant/Director positions.

50. Sometime in 2010 or 2011, TSA and FAMS created the TSES designation for TSA employees, allowing TSA to fashion its own rules for promotion to executive-level staff. Qualifications to be promoted to this new TSES designation were "developed by TSA leadership. . . for the purpose of bypassing the OPM [Office of Personnel Management] SES certification process and congressional budget approval." *See* Exhibit 2, Decl. of Arnold Cole at ¶ 23. Unlike those who obtain SES certification, those who are promoted to TSES level positions cannot take their classification and work as SES executives in other federal governmental agencies. *Id.* at ¶24. All SES level positions within TSA are designated as TSES positions. *Id.*

51. If an agent wants to be promoted to a K Band or TSES position, he or she must apply to an open posting.

52. In 2019, TSA established an Executive Resources Counsel (ERC). All applications are submitted through the USAJOBS website, and a computer program reviews them and disqualifies those that fail to meet certain minimum requirements. For K Band positions, applicant responses and resumes are reviewed by TSA Human Capital Recruitment and Hiring to determine who is best qualified. The Selecting Official (who is typically the SAC whose office has the vacancy) receives a list of candidates and may interview some, none, or all of these candidates. If the Selecting Official decides to interview some or all of the candidates, a panel is formed including the SAC, and the SAC consults their Regional Director or Executive Director and other panel members to determine who gets an interview. The interviews themselves are to be conducted through a "structured interview toolkit," including identified questions, and each interviewer is to score each candidate. The results of the interviews and ranking of the candidates is forwarded to a FAMS' Assistant Administrator for final review. The Assistant Administrator makes a recommendation and Senior Executive Management will either select that recommended candidate, or select another candidate.

53. In reality, however, promotion decisions do not follow this procedure. Instead, the list of the successful USAJOBS applicants is forwarded to FAMS' Headquarters. The Assistant Directors and Deputy Assistant Directors in FAMS Headquarters pares the list to six candidates. This list of six candidates is then sent to the Selecting Official (again, usually the SAC whose office has the vacancy), who, based on his or her judgment, decides whether any of the candidates should be interviewed. Often, the Selecting Official conducts no interviews or, on an ad hoc basis, calls the SAC supervising a candidate to obtain background and recommendations. The Selecting Official then sends his or her top three candidates back to FAMS Headquarters. At Headquarters, the Assistant Directors and Deputy Assistant Directors ultimately make the decision on who will be promoted. These individuals may select from the list of three candidates provided by the Selecting

Official, or choose any other candidate.

54. There is no guideline, standard, or rule that constrains the Assistant Directors and Deputy Assistant Directors in determining who they want to be on the top six list for promotion.

55. In practice, there is no standard or consistency as to what applicants are asked in the interviews, or how they are evaluated based on their answers. The process is completely opaque, but very consistent in weeding out African American applicants.

56. The first level at which African Americans applicants are weeded out of promotional opportunities is in the creation of the top six most eligible list by those at FAMS Headquarters.

57. On the rare occasions that African Americans make it onto the most qualified list for a position, they are almost always overlooked for a preferred white candidate.

58. For specified K-Band SAC and the new TSES positions (created by TSA) vacant within FAMS, TSA policy, through the ERC, provides that TSA Human Capital Recruitment and Hiring will supply TSES Ranking Panel Instructions to three identified panelist members. One of the panelist members is selected as the 'Lead.' If the position warrants it, panelist members review and score Professional Technical Questions (PTQs) completed by applicants. Panelist members may be from FAMS and/or TSA. Panelist members may rank the applicants individually but must come to a minimum consensus before the rating process is completed. The panel's ratings are submitted back to Human Capital. Although the ERC may be required to approve the candidate for the K-Band and/or TSES position, the selection is completed by a process that includes FAMS K-Band level or TSES employees and ultimate approval of the selection to be submitted to the ERC is made by FAMS. ERC then convenes to 'Approve' the selections from the various components of TSA including those submitted by FAMS to fill the specified K-Band SAC and TSES positions. The members of ERC should come to a decision on the submitted selection as approved or disapproved. The Chair reserves the right to render the final decision in the event a

decision cannot be reached. If the ERC does not approve a recommendation, then the Assistant Administrator, Deputy Assistant Administrator, and/or Director of the requesting office is afforded an opportunity to attend the following ERC meeting to receive an explanation as to why the selection was not approved.

59. However, in practice, this new TSES designation became fertile ground "to promote additional white male FAMS agents over more qualified African American and female agents." Exhibit 2, Decl. of Arnold Cole at ¶ 23. For example, TSA does not require FAMS agents seeking promotion to TSES positions to complete the SES certification process; instead, an applicant merely may highlight certain competencies (called Executive Core Qualifications, or ECQs) on his or her resume.

60. Like promotion to K Band discussed above, applicants apply through USAJOBS, but receive an email from FAMS Headquarters to learn whether they have been selected to make it to the next round. This decision, like K Band promotions, is made by a select, small group of administrators and is opaque to applicants. If the position is for a field SAC position, for example, those in the FAMS Headquarters will select those who move on to interviews; if the applicant is applying for a FAMS deputy director or director position, those in TSA Headquarters will decide who will be interviewed. Following the interviews, the FAMS assistant administrator will ultimately make the promotion selection. The TSES promotion process, one that is idiosyncratic to TSA, allowed FAMS "leadership to promote additional white male FAMS agents over more qualified African American and female FAMS agents". *See* Exhibit 2, Decl. of Arnold Cole at ¶ 23.

61. In sum, Defendant's promotion policy and practices for K Band and TSES positions vary on the exact methodology, but all contain the same material components that are excessively subjective, lack objective job-related criteria, and are ultimately made by a small group of the same

people – executives who make up an "old boys' network" brought to TSA from the Secret Service, from which many of TSA's original leaders were employed.

62. Defendant's promotion policy and practices have resulted in a disparate effect on African American and female FAMS agents. For example, out of the total of 200 J Band positions, just 11 African Americans currently hold J Band positions.

63. Out of the 14 Black females who made it to the J Band level, *since the inception of the agency*, only 6 were ever selected for a K Band position, two of which were promoted only after the original complaint in this action was filed.

64. Currently, there are approximately 66 K Band law enforcement jobs at FAMS. Of those 66 positions, just 10 are held by African Americans and just 12 are held by females (and 4 of these females are African American, resulting in just 18 of the 66 K Band positions currently held by Black or female agents).

65. Approximately 46 FAMS agents have been promoted to TSES positions since the inception of that designation. Of those 46 TSES agents, none have been female African Americans. Just 8 Black male agents and just 7 female agents (nearly all of whom are white) have been promoted to TSES positions.

66. As of 2022, 18 of the 20 FAMS field offices were led by men, and 15 of the 19 occupied FAMS field office SAC positions were filled by white male agents.

## D. TSA's PROMOTION POLICIES AND PRACTICES ARE ROOTED IN A HISTORY AND CULTURE OF DISCRIMINATION AND HAVE A DISPARATE EFFECT ON AFRICAN AMERICAN FAMS AGENTS

67. FAMS has failed to protect its African American agents from discrimination in promotion to senior level positions. From the inception of the agency in 2001, continuing up to and including the time of adjudication of these claims, the Plaintiffs and the Class have been discriminated

against in selections for competitive positions ranked K Band and above on the basis of their race by the employment policies, procedures and practices of FAMS. The promotion system is excessively subjective, is not job-related and has been implemented through a "good old boys' network" to the exclusion of African American agents. These practices have an adverse impact on African American agents that cannot be justified by business necessity. The continued use of such policies and practices reflects an intent to discriminate against African American agents in violation of Title VII. These practices also independently constitute intentional discrimination on the basis of race. These alleged discriminatory policies and practices adversely affect the ability of African American agents to secure promotion.

68. The selection process under Defendant's policies and procedures has a disparate impact on African American agents that is neither job-related nor required by business necessity. Rather, FAMS' selection process promotes agents based upon factors, other than knowledge, skills, and ability, that disproportionately benefit white agents, which has a disparate impact upon African American agents. Further, FAMS has known that its promotion practices have a disparate impact on African American agents. The continued use of such policies and practices reflects an intent to discriminate against African American agents in violation of Title VII.

69. TSA and an expanded FAMS were born out of the September 11, 2001 terrorist attacks, and the agency's leadership was largely filled by United States Secret Service executives including, but not limited to, Directors Tom Quinn, Dana Brown and Robert Bray; Deputy Directors Jim Byers and Mike Novak; Assistant Director John Novak; and Deputy Assistant Directors Patrick Sullivan and Kevin Greba. *See* Exhibit 2, Decl. of Arnold Cole at ¶ 11.

70. These new FAMS leaders brought with them the discriminatory promotion practices from the Secret Service that were subject to litigation in the lawsuit styled *Moore, et al. v. Chertoff,* Civ. Action No. 00-cv-0953 (D.D.C.), which alleged similar discriminatory practices on a class-wide

basis, including but not limited to the agency's promotion practices that disparately impacted African American Special Agents. *Id.* at ¶ 19 ("FAMS' hiring and promotional systems were modeled after the Secret Service system by individuals from Secret Service who took on leadership roles at FAMS"); Exhibit 3, Decl. of Mary Ellen Mack Dickey at ¶ 14 ("The FAMS leadership was founded on racism when they hired Secret Service Agents to start the agency who were also named in discriminatory incidents within the Secret Service"). That case resulted in a settlement providing, *inter alia*, back and front pay for agents who were blocked from promotion due to their race and changes to its hiring and promotion procedures.

71. Given the long history of racial discrimination at the Secret Service, it is not surprising that the same pattern of discrimination permeated the culture at TSA and FAMS while these former Secret Service executives were in leadership at FAMS and carried on after they left the agency.

72. For example, in 2010, it was learned that white supervisors in a FAMS field office used the office's crew assignment board to ridicule and keep score on women and African Americans, among others. The FAMS office used the crew assignment board to resemble the TV game show "Jeopardy," and included categories containing derogatory nicknames referring to women, African Americans, Hispanics and gays and lesbians. This led to a DHS Office of the Inspector General (OIG) review of widespread misconduct and illegal discrimination and retaliation of FAMS, requested by Senator Bill Nelson and Congressmen Edolphus Towns and Darrell Issa. The report found that FAMS' employees' perceptions of discrimination and retaliation were extensive, and that in its investigation, the OIG "heard too many negative and conflicting accounts of events to dismiss them, [and that] [m]any Federal Air Marshals and some supervisors think they have been discriminated against, fear retaliation, and believe there is much favoritism." In light of these findings, the OIG provided detailed recommendations to TSA and FAMS leadership to ameliorate the discriminatory culture and conduct of leadership at FAMS. Unfortunately, gender and racial

discrimination continued unabated.

73. In 2020, the United State Government Accountability Office, in a report requested by Congress due in part to the large number of discrimination complaints against FAMS, found that the agency failed to fully implement steps to prevent discrimination that it had committed to in 2012.

74. Not surprisingly, a February 26, 2022, study of federal law enforcement officials reflects that more than half of female TSA employees (of which FAMS is a part) have experienced sexual harassment and gender discrimination in the workplace. *See* Exhibit 1, "Gender and Representation at the Department of Homeland Security: Executive Summary" at 7, 9 (finding that very few women made a formal report for fear of retaliation, being ostracized by peers and supervisors and belief that nothing will be done due to male toxicity in the workplace). The study also showed that nearly 75 percent of female TSA employees believe they are not paid equally to men doing the same work; less than 30 percent believe (1) men and women are treated equally in terms of receiving work-related awards, and (2) that TSA leadership is committed to ensuring that all employees are paid based on work performed regardless of gender. *Id.* at 5. Further, the study shows a sexist culture existing at TSA, in which nearly 70 percent of women do not view the agency as having an inclusive organizational culture, and over 90 percent of female TSA employees view the agency as having difficulty retaining women. *Id.* at 6, 14. Not surprising, given these findings – and the underrepresentation of women in management and TSES positions discussed herein – half of all women at TSA experience gender bias and perceive a glass ceiling on promotion. *Id.* at 12 (also reporting that just 4 percent of male employees perceive there to be gender bias in promotion, reflecting the sexist culture of the male dominated leadership in TSA and other DHS agencies).

75. The study of federal law enforcement officials also reflects that more than half of minority

male TSA employees (again, of which FAMS is a part), and nearly half of minority female TSA employees experienced racial discrimination in their workplace. *See Id.* at 10. Many of these employees reported racial discrimination, but very few were satisfied with the official outcome. *Id.* at 11.

76. A number of senior officials and others saw that TSA's promotion policies were discriminatory against Black employees. For example, a former FAMS Assistant Deputy Director for Field Operations and later, the operations head for the Atlanta Field Office, one of the most active airports in the world, noted that there were no Black supervisors in the Atlanta Field Office and just a single female supervisor. *See* Exhibit 2, Decl. of Arnold Cole at ¶¶ 12-16.

77. When Cole recommended highly qualified African American and female Air Marshals for positions in leadership, his recommendations were repeatedly "ignored and discounted". *Id.* at ¶ 19.

78. FAMS would game the system to exclude Black candidates from promotion "repeatedly [sending Cole] lists of potential candidates that had one token African American on the list who was clearly not qualified," while ignoring Cole's recommendations of highly qualified Black applicants. *Id.* at ¶ 21.

79. During his tenure at TSA, he noted that the agency would allow for few African Americans at the K Band and TSES levels and once this quota was filled, no other Black or female applicants would be considered for promotion. *Id.* at ¶¶ 25, 28 ("In short, TSA's culture was to have a quota of African Americans and females in the SAC positions, and once that quota was met, all other K Band and TSES positions were foreclosed from African Americans and women, no matter how qualified they were."); *Id.* at ¶ 34 ("[T]here was a balkanization in the TSA based on race and gender, such that African American and female Air Marshals were simply not seriously considered for promotion, regardless of the appearance of competitiveness based on promotional practices.");

*Id.* at ¶ 22 ("Over time, I observed that highly qualified African American and female Air Marshalls were simply not seriously considered for promotion.").

80. This system of denying qualified Black and female applicants was understood by Mr. Cole as a pattern and practice of racial and gender discrimination, as shown by the above referenced quota system and that when he recommended a white male Air Marshal for promotion, his recommendation "would be immediately adopted without hesitation." *Id.* at ¶ 26.

81. When challenging this pattern and practice of racial and gender discrimination, Cole's concerns were not only ignored, but he "was vilified as causing trouble," and was told by David Hand, Assistant Director for Field Operations, that he "was making waves with my complaints, and that I should get out of TSA because I had a target on my back." *Id.* at ¶¶ 29-31. Consequently, it was evident that "TSA senior leaders have, for a substantial period of time, actively and intentionally blocked African Americans and female agents with both experience and excellent leadership skill and potential, from being promoted because of their race and/or gender." *Id.* at ¶ 33.

82. Other successful FAMS agents similarly understood that TSA's promotional practices were infected with racial and gender discrimination and constituted a discriminatory pattern and practice. Mary Ellen Mack Dickey, an African American woman who achieved promotion to a K Band position was told by other ASACs that as a Black woman, she was a "wild card," *See* Exhibit 3, Decl. of Mary Ellen Mack Dickey at ¶ 9. Indeed, Dickey was only promoted to K Band because FAMS used a Direct Promote Process, in which "agency leaders select the candidate for promotion to a specific duty assignment without competing against their peers." *Id.* at ¶ 8. This system was a means of meeting FAMS' quota of Black promotions while "making it clear to all agency employees that FAMS leadership viewed Black agents as not otherwise qualified for promotion compared to their white peers, even though African Americans were often more educated and had

worked more positions with the agency than their white counterparts." *Id.*

83. Sherry Smith, an Assistant Supervisory Air Marshal in Charge at FAMS' Philadelphia Field Office, observed her SAC discussing white male agents who were recently promoted over more qualified Black or female agents, saying that the promotion was because the white man "was a nice person." *See* Exhibit 4, Decl. of Sherry Smith at ¶ 6. Smith found it "widely understood that if you were not part of the "good ole boys network" or not of a certain color/race, you would not be reassigned/promoted." *Id.*

84. As discussed here, "[t]he promotional disparity is well known in FAMS and TSA. Becauseof this, candidates of color and women often do not even apply for promotions. There is a general sense that Headquarters will refuse to promote people of color and female agents and/or make work life exceedingly difficult for those people of color or female agents who do try to get promoted. The attitude of many female FAMS agents and those of color is, 'why bother?' trying to get promoted within the service." *See* Exhibit 2, Decl. of Arnold Cole at ¶ 37; Exhibit 3, Decl. of Mary Ellen Mack Dickey at ¶¶ 12-13 ("I retired from the FAMS because I realized that there was not upward mobility for me, and it was time to leave. I assert that FAMS has a discriminatory promotion procedure, and that it unfairly limits and curtails the promotional opportunities for African Americans and female agents."); Exhibit 4, Decl. of Sherry Smith at ¶ 8 ("I retired from FAMS because I realized that upward mobility for me as an African American and as a woman would not be possible").

85. FAMS has established an unwritten practice of allowing white agents to be promoted to positions in the same geographic area in which they currently work, while requiring African American agents to move to other geographic locations to be promoted to competitive positions. Exhibit 2, Decl. of Arnold Cole at ¶ 36.

86. Further, Black FAMS agents have been more severely disciplined than white agents who

committed similar or more serious infractions, thereby delaying their advancement and promotion compared to white agents.

## E. <u>FACTS RELEVANT TO PLAINTIFFS' FILING ADMINISTRATIVE CLASS CLAIMS</u>

87. On or about February 6, 2022, Plaintiff Sutton contacted an EEO counselor about a February 1, 2022 denial of his application for promotion as an Assistant Supervisory Federal Air Marshal in Charge (ASAC). The case number assigned was HS-TSA-01044-2022.

88. Plaintiff Sutton filed a formal EEO complaint dated March 16, 2022, alleging retaliation, and race and color discrimination.

89. Later, Plaintiff Sutton wished to amend his individual EEO complaint to include a class claim, but was first required to seek EEO counseling. Exhibit 5, Decl. of Pam Keith at ¶¶ 6-7.

90. Accordingly, on July 22, 2022, Plaintiff Sutton sent an email to the EEO Counselor, Danella Piper, in an attempt to obtain EEO counseling for his class claim, with the ultimate goal of adding a class claim to his pending EEOC Complaint. *Id.* at ¶ 8. Plaintiff Sutton's email contained the full extent of his class allegations and consisted of three sentences; it was not a formal EEO class complaint. *Id.* at 9. The email asserted that Defendant maintained a pattern and practice of overlooking African American applicants, and that he sought to pursue his claim on behalf of himself and all similarly situated African Americans.

91. EEOC Regulation 29 CFR § 1614.204(d)(1) states that:

> Within 30 days of an agency's receipt of a [class] complaint, the agency shall: Designate an agency representative who shall not be any of the individuals referenced in §1614.102(b)(3) and forward the complaint, along with a copy of the Counselor's report and any other information pertaining to timeliness or other relevant circumstances related to the complaint, to the Commission. The Commission shall assign the complaint to an administrative judge or complaints examiner with a proper security clearance when necessary. The administrative judge may require the complainant or agency to submit additional information relevant to the complaint.

92. Despite the fact that Plaintiff Sutton submitted only an email to initiate EEO counseling on his class claim, and never filed a Formal EEO Class Complaint, Plaintiff Sutton's class claim was assigned to Administrative Judge Montez Sterling Cobb. *Id.* at ¶¶ 11-12.

93. On or about November 3, 2022, AJ Cobb issued a Request for Information regarding Plaintiff Sutton's class claim, now referred to as an EEO Class Complaint although nothing more than Plaintiff Sutton's three sentence email was before the AJ. *Id.* at ¶¶ 30-31. The Request for Information made no reference to a class claim of any other class representative plaintiff, and no other class claims were consolidated with Plaintiff Sutton's class claim. *Id.*

94. Like Plaintiff Sutton, Plaintiff Jordan also tendered an email to add a class claim to his pending EEOC charge HS-TSA-02510-2022. But unlike Plaintiff Sutton, Plaintiff Jordan's claim was still in the informal counseling phase of the process when he sought to add the class claim.

95. On August 4, 2022, Daniel Ricketts, EEO Specialist Civil Rights Division, EEO Branch, Complaints Section, TSA, sent an email with a DocuSign Notice to access a Notice of Right to File a Formal Complaint of Discrimination related to HS-TSA-02510-2022.

96. Plaintiff Jordan and Counsel could not access the Notice of Right to File a Formal Complaint until August 8, 2022. *Id.* at ¶¶ 16-17; Exhibit 6, Decl. of Jeff Schrameck at ¶¶ 3-7; Exhibit 7, Decl. of Freeman Jordan at ¶¶ 4-6.

97. On August 23, 2022, Plaintiff Jordan filed an internal Formal EEO complaint alleging race discrimination in promotion practices on behalf of himself and a class of African American FAMS employees. Exhibit 5, Decl. of Pam Keith at ¶ 18; Exhibit 6, Decl. of Jeff Schrameck at ¶ 9; Exhibit 7, Decl. of Freeman Jordan at ¶ 7.

98. On or about October 22, 2022, TSA issued a notice to Plaintiff Jordan, informing him that his individual claims were being held in abeyance because a class action complaint had been filed and was pending. And that according to EEOC procedures, Plaintiff Jordan's individual claims

would be held in abeyance while the class certification proceedings in another case was proceeding. Exhibit 5, Decl. of Pam Keith at ¶ 22.

99. Plaintiff Stephens filed a class claim via counsel on or about July 29, 2022. She wrote and expressed an intent amend to add a class claim to her existing EEOC charge, alleging a pattern and practice of racial discrimination in FAMS' promotional practices on behalf of herself and a class of African American FAMS employees. *Id.* at ¶ 24.

100. Plaintiff Stephens was in the process of working on that claim, but on or about September 9, 2022, she received notice similar to Plaintiff Jordan stating that her individual claims were being held in abeyance because of a class action complaint. Plaintiff Stephens' notice also only referred to her individual claim. No other action was taken on her class claim. *Id.* at ¶ 25.

101. These notices said nothing about consolidating Plaintiff Jordan's class claim with that of any other person. *Id.* at ¶ 23. In fact, the notices did not even mention Plaintiff Sutton's name or reference his class case number. The appeal rights referenced in the notices stated that Plaintiffs Jordan and Stephens had the right to appeal the decision to hold their individual claims in abeyance, but they said nothing about the treatment of their class claims. *Id.* Nor could they, because the regulations related to treatment of class claims are silent as to consolidating class claims with existing class claims contained in a separate Formal EEO Complaint tendered by another employee. *See id.* at ¶ 27.

102. Likewise, nothing in the EEOC Management Directive related to complaints of class discrimination in the federal government speaks to the consolidation of one employee's class claims with another contained in an existing Formal EEO Class Complaint. Only individual claims similar to existing class claims are held in abeyance pursuant to this EEOC procedure, not class claims.

103. At no time did TSA inform Plaintiffs Jordan or Stephens that it was consolidating their

class claims with Plaintiff Sutton or moving the AJ to consider their class claims. *Id.* at ¶ 26.

104. On August 3, 2022, in his initial interview with an EEO counselor, Plaintiff Parks filed a class claim. Plaintiff Parks was working with Patrick Cleary, an EEO Specialist at TSA's Equal Employment Office. At this time, Plaintiffs Sutton, Jordan and Stephens were working with a different EEO office representative, Christopher Smoot. *Id.* at ¶¶ 28-29.

105. In August of 2022, Plaintiffs' counsel spoke with Christopher Smoot, stating that Plaintiffs were hoping to file as a team, and for all of the claims to be consolidated, but was informed that TSA was not going to consolidate the class claims. *Id.* at ¶ 28.

106. On or about November 3, 2022, the AJ on Plaintiff Sutton's claim issued a Request for Information Regarding his EEO Class Complaint. *Id.* at ¶ 30.

107. The Request for Information reflects that the AJ only had before him the class claim of Plaintiff Sutton. There were no other class representative plaintiffs mentioned in his correspondence. *Id.* at ¶ 31.

108. The AJ gave Plaintiff Sutton two weeks to present a substantial amount of information on the Class to which Plaintiff Sutton did not have ready access. *Id.* at ¶ 32.

109. Given the short time frame permitted by the AJ, Counsel for the Agency, Eric Kaplan, reached out to Counsel for Plaintiff Sutton and asked for consent to file a motion for extension of time to reply to the AJ's request for information, and to ask for a more conventional briefing schedule. *Id.* at ¶ 33.

110. Counsel for Plaintiff Sutton consented to the motion, and Counsel for the Agency filed the motion for extension with the AJ on or about November 15, 2022. *Id.* at ¶ 34.

111. The AJ did not respond to the motion to extend the deadline to respond to the request, even though the motion was timely filed before the filing deadline, and was a consent motion. *Id.* at ¶ 35.

112. Because the AJ never responded to the consent motion, on November 21, 2022, Counsel for the Agency filed an opposition to class certification. *Id.* at ¶ 36.

113. In keeping with the fact that Plaintiffs Stephens and Jordan's separate class claims were not before the AJ, Counsel for the Agency's opposition to class certification did not in any way reference consolidation of these Plaintiffs' class claims with Plaintiff Sutton's EEO class case. *Id.* at ¶ 37.

114. Because the AJ did not rule on the timely filed Joint Motion for Extension, on November 29, 2022, the Plaintiffs' counsel filed a Motion to Stay Proceedings and to Permit Discovery to allow Plaintiffs the information needed to formulate the parameters of the class and explain why Plaintiff Sutton met the Rule 23 class certification criteria. *Id.* at ¶ 38.

115. Plaintiffs' Motion for a Stay and Leave to Conduct Discovery mentioned the fact that Plaintiffs Stephens, Jordan and Parks had class claims they wished to pursue, but did not seek consolidation of class claims of Plaintiffs into Plaintiff Sutton's EEO class case. *Id.* at ¶ 39.

116. Plaintiffs then filed a Reply to Defendant's opposition to class certification on December 16, 2022. In that Reply, Plaintiffs' Counsel specifically raised the fact that the class claims of Plaintiffs Stephens, Jordan and Parks were not before the AJ, and that Plaintiff Sutton was seeking a stay of proceedings to permit discovery and consideration of the class claims that were not before the AJ. *Id.* at ¶¶ 40-41.

117. The AJ did not rule on the motion for an extension or on the motion for a stay and leave to conduct discovery until May 18, 2023, when he issued a decision denying everything that Plaintiff Sutton asked for, including an extension, and denied class certification. *Id.* at ¶ 41.

118. Importantly, and consistent with the fact that no other class claims were before the AJ, including Plaintiffs' class claims, AJ Cobb's May 18, 2023 Decision and Order Denying Class Certification makes no reference to Plaintiffs Stephens, Jordan and Parks or their class claims. *Id.*

at ¶ 42.

119. The Department of Homeland Security's Office of Civil Rights and Civil Liberties' June 27, 2023 Final Order on Plaintiff Sutton's class claims likewise does not reference Plaintiffs Stephens, Jordan and Parks or their class claims. This further demonstrates that Plaintiffs' class claims were not consolidated with Plaintiff Sutton's EEO Class Complaint. *Id.* at ¶ 43.

120. In the period when the AJ was considering his decision on Plaintiff Sutton's class claim, Plaintiff Parks was still pursuing his class claim, and on December 13, 2022, Plaintiff Parks timely filed his Formal EEO Class Complaint containing detailed class claims. *Id.* at ¶ 44. In other words, when Plaintiff Parks filed his Formal EEO Class Complaint, the AJ was already considering Plaintiff Sutton's separate, and much less detailed and descriptive class claims.

121. On or about December 16, 2022, Plaintiff Parks received the letter of receipt of his claim. *Id.* at ¶ 45.

122. On or about December 20, 2022, Plaintiff Parks received the same letter as Plaintiffs Stephens and Jordan, with respect to holding his individual claims in abeyance. *Id.* at ¶ 46.

123. Like the letter to the other Plaintiffs, the letter to Plaintiff Parks indicated that his individual claims would be held in abeyance, but said nothing about the treatment of his class claim. *Id.* at ¶ 47.

124. Plaintiff Parks' class claims were not referred to the EEOC Commission, and were not assigned to an AJ in accordance with 29 CFR § 1614.204. *Id.* at ¶ 48.

125. Plaintiff Parks' class complaint bore no resemblance to the class claims of Plaintiffs Sutton, Stephens or Jordan. Rather than the three sentences asking for counseling of class claims, Plaintiff Parks' class claim was much more robust, and included a detailed eight page-long break-down of TSA policies and practices and how those policies and practices discriminated against African American FAMS employees on a class wide basis. *Id.* at ¶ 49.

126. TSA did not move the AJ to consolidate Plaintiff Parks' class claims into his consideration of Plaintiff Sutton's class claims. *Id.* at ¶ 50.

127. TSA did not file a motion to reopen briefing related to Plaintiff Sutton's class claims to include Plaintiff Parks' claims, or any other mechanism to have Plaintiff Parks' class claims considered by the AJ. *Id.* at ¶ 51.

128. Approximately one month after the AJ ruled on Plaintiff Sutton's class allegations, on or about July 23, 2023, Plaintiff Parks received notice of the acceptance of his EEOC charge, in correspondence from Mr. Cleary. *Id.* at ¶ 52.

129. In response, Plaintiffs' counsel specifically informed Mr. Cleary that Plaintiff Parks' Formal EEO Class Complaint had not been addressed, and that he was asserting those claims on behalf of himself and those similarly situated. *Id.* at ¶ 53.

*130.* On or about July 26, 2023, Mr. Clearly indicated that he would not accept Plaintiff Parks' class claim. Plaintiffs' counsel made clear that Plaintiff Parks was continuing to assert class claims regardless of what the EEO counselor was willing to accept. *Id.* at ¶ 54.

131. Mr. Cleary never issued a final agency decision rejecting and/or dismissing Plaintiff Parks' class claims, thus those claims remained open and pending until Plaintiff Parks filed the instant lawsuit. *Id.* at ¶ 55.

## F. FACTS RELEVANT TO THE INDIVIDUAL PLAINTIFFS

### a. FACTS RELEVANT TO PLAINTIFF MICHAEL PARKS

132. Plaintiff Parks was a Supervisory Federal Air Marshal (SFAM) who was hired by FAMS in February of 2002, to join the Atlanta field office.

133. Plaintiff Parks transferred to FAMS Headquarters in 2005 and served there until 2009.

134. During that time, he applied to no less than 50 K Band positions nationwide.

135. In 2009, Plaintiff Parks was informed by his SAC that senior leadership wanted to promote

him to SFAM for a newly created K-9 Supervisory position with specific specialized Knowledge, Skills and Abilities (KSAs) – a list of special qualifications and personal attributes for a particular position to describe in applying for the position.

136. Plaintiff Parks applied and was informed by his SAC that he was selected for the promotion to be announced in the next 3 days.

137. When the promotion list was posted agency wide, however, it was given to a white male who did not have any of the specialized K-9 experience (KSA) that was advertised.

138. Plaintiff Parks was later informed by his SAC that senior leaders owed a favor to the white male who was selected, and that they would try to promote Plaintiff Parks at a later date.

139. The selected white male FAM, Matt McChessney, directly called Plaintiff Parks and apologized for taking the position from him, and stated he answered the specialized KSAs by writing, "I have no K-9 experience but I'm willing to learn if selected."

140. In 2009, Plaintiff Parks was contacted by another senior official in his chain of command apologizing for how he was treated and directly instructing Plaintiff Parks to apply to the Chicago office for promotion.

141. Plaintiff Parks immediately applied for the Chicago office SFAM position. Again, he was informed by his SAC 3 days prior to the announcement being posted that he was selected for the promotion.

142. When the promotion list was posted agency-wide 3 days later, the position was given to a white female.

143. A few months later, Plaintiff Parks decided to transfer back to the Atlanta Field Office because of how he was being discriminated and passed over on multiple occasions by white officials.

144. In Sept 2011, Plaintiff Parks was finally selected for promotion from I Band to J Band due

to the consistent advocacy of his African American SAC.

145. In 2014, Plaintiff Parks applied for another promotion for a specific, specialized K-9 Manager position at the TSA K-9 training ASAC in San Antonio, Texas.

146. He was contacted by his manager and informed he was selected for the promotion due to his extensive and specialized K-9 experience.

147. When his ASAC, Brian Persaud, was informed that Plaintiff Parks was selected for another promotion, he became upset because Plaintiff Parks did not consult with him before applying for the position and he stated he felt blindsided by Headquarters when they informed him of Plaintiff Parks' promotion.

148. Plaintiff's ASAC, Brian Persaud, stated he purposely called Headquarters to inform them that he did not concur with Plaintiff Parks' promotion. The promotion was given to a white male with 10 years less experience than Plaintiff Parks.

149. Between 2014 and the present, Plaintiff Parks applied for over 40 more promotions and was not selected.

150. On July 20, 2022, Plaintiff Parks contacted an EEO counselor about being denied for three promotions in June of 2022, alleging individual race and color discrimination and retaliation for engaging in prior EEO activity.

151. On August 3, 2022, in his initial interview with an EEO counselor, Plaintiff Parks filed a class claim.

152. On December 13, 2022, Plaintiff Parks filed a Formal EEO Class Complaint. By this time, the AJ was already considering Plaintiff Sutton's separate, and much less detailed and descriptive class claims, and did not consider Plaintiff Parks' Formal EEO Class Complaint in rendering his decision on Plaintiff Sutton's class claims.

153. As referenced herein, Plaintiff Parks' Formal EEO Class Complaint is materially different

than Plaintiff Sutton's class claims and his class claims in his eight page Formal EEO Class Complaint were not consolidated with Plaintiff Sutton's class complaint.

154. Plaintiff Parks' class claims were not referred to the EEOC Commission, and were not assigned to an AJ in accordance with 29 CFR § 1614.204. Exhibit 5, Decl. of Pam Keith at ¶ 48.

155. TSA did not move the AJ to consolidate Plaintiff Parks' class claims into the matter pending before him. *Id.* at ¶ 50.

156. There was no motion to reopen the briefing to include Plaintiff Parks' claims, or any other mechanism to have Plaintiff Parks' class claims considered by the AJ. *Id.* at ¶ 51.

157. Approximately one month after the AJ ruled on Plaintiff Sutton's class allegations, on or about July 23, 2023, Plaintiff Parks received notice of the acceptance of his EEOC charge, in correspondence from Mr. Cleary. *Id.* at ¶ 52.

158. In response, Plaintiffs' counsel specifically informed Mr. Cleary that Mr. Parks' Formal EEO Class Complaint had not been addressed, and that he was asserting those claims on behalf of himself and those similarly situated. *Id.* at ¶ 53.

*159.* On or about July 26, 2023, Mr. Clearly indicated that he would not accept the class claim. Plaintiffs' counsel made clear that Mr. Parks was continuing to assert class claims regardless of what the EEO counselor was willing to accept. *Id.* at ¶ 54.

160. Importantly, Mr. Cleary never issued a final agency decision rejecting and/or dismissing Plaintiff Parks' class claims, thus those claims remained open and pending until Plaintiff Parks filed the instant lawsuit. *Id.* at ¶ 55.

161. Also, when Plaintiffs Parks, Sutton and Jordan received notice that their individual claims were released from being held in abeyance, Defendant took no action on their class claims. *Id.* at ¶ 56.

162. To this day, Plaintiff Parks has not received a final agency decision on his class claims. *Id.*

at ¶ 57.

163. Because Plaintiffs filed their initial complaint more than 180 days from the date Plaintiff Parks filed his Formal EEO Class Complaint, his class claims of race discrimination is timely. *Id.* at ¶ 63.

164. Plaintiff Parks' individual claims of discrimination and retaliation in being denied for three promotions in June of 2022 has been fully exhausted.

### b. FACTS RELEVANT TO PLAINTIFF DR. SUKEENA STEPHENS

165. Plaintiff Stephens joined the Federal Air Marshal Service in June 2002 when she began as an Air Marshal in the New York Field Office. She remained there until 2006.

166. In October of 2006, Plaintiff Stephens was transferred to the Office of Security Assessment in Arlington, VA. She worked there until 2009.

167. In September of 2009, Plaintiff Stephens was promoted to Supervisory Air Marshal in the Arlington office. She served in that role until October of 2012.

168. While serving as a Supervisory Air Marshal, Plaintiff Stephens assisted in developing policies for recommended implementation of MANPADS Vulnerability Assessments at international departure airports.

169. She also established strategic relationships with TSA representatives and embassy personnel to provide training and increase MANPADS awareness globally.

170. She received accolades for developing a triage methodology with the Homeland Infrastructure Threat and Risk Analysis Center to identify vulnerabilities, increasing security and compliance with TSA transportation security policies, directives, and regulations.

171. She also coordinated and led one of the first *Insider Threat* assessments at Los Angeles Airport and facilitated the program transfer from Investigations to FAMS.

172. Plaintiff Stephens served as Acting Assistant to the Special Agent in Charge, Office of Security Assessments. Her duties included coordinating the scheduling of FAMS agents for missions and assessments in collaboration with SAC.

173. She routinely represented the SAC during division staff meetings and collaborated with the Office of Personnel & Training to manage training programs.

174. From May 2011 to August 2011, she served under the immediate direction of the Assistant Administrator and assisted with establishing the Office of Professional Responsibility.

175. Plaintiff Stephens analyzed, managed, adjudicated, presided, and determined disciplinary action for all Transportation Senior Executive Service (TSES) employees, K/M Bands, Federal Security Directors, SACs, FAMS employees, and TSA representatives. She further created procedures to establish a uniform and fair process to adjudicate cases.

176. From Aug 2010 to January 2011, she served as Acting SAC of the Office of Security Assessments, successfully performing all the SAC duties and responsibilities.

177. Impressively, Plaintiff Stephens achieved 100% compliance with required medical examinations for all FAMS agents assigned to the Office of Security Assessments.

178. At that point, she transferred to the Washington area field office in Chantilly, VA. She served as the Administrative Supervisory Federal Air Marshal (Admin SFAM). In that capacity, she was responsible for all administrative activities to operate the field office. The commitment included but was not limited to: (1) employee discipline; (2) random drug and alcohol screening as required for their position; (3) classified information custodian; (4) facility plant and property management; and (5) all related functions not directly related to the deployment of Federal Air Marshals to protect the flying public. She continued to serve as a Supervisory Air Marshal in that office until August of 2017.

179. She was then transferred to lead the Visible Intermodal Prevention and Response Program

in Herndon, VA. She managed, directed, and supervised civilians and Federal Air Marshals as Watch Officers in the Joint Coordination Center (JCC). She ensured VIPR Program's goals were supported by the 16 field offices, 30 teams and 277 officers across the United States by recommending solutions to operational problems and modifying work procedures to drive results to meet the critical needs of the agency. She also served as the Lead Logistics Chair for the Critical Incident Management Group. She led, managed, and facilitated the coordination and logistical movement of supplies such as 10,200 cases of MREs, 7,800 cases of water, 446 generators, and 429 gas cans to assist in the recovery efforts during Hurricanes Irma, Harvey, and Maria. She managed the deployment of 311 Federal Air Marshals to the Southwest Border. The task included finding lodging for 311 officers, ordering equipment, arranging flights, reserving rental cars, and maintaining a deployment roster of volunteers. In March 2020, she managed the deployment of FAMS agents to be deployed under the Emergency Support Function #13- Public Safety and Security Annex. These officers were needed to provide security for quarantined citizens from possible exposure to COVID-19. Over 40 FAMS agents were deployed to Lackland and Travis Air Force Bases. She remained in that role until she was given another assignment in August of 2022.

180. She now serves as the Assistant Supervisory Federal Air Marshal in Charge and Ombudsman/Diversity, Equity, Inclusion, and Accessibility Manager.

181. Plaintiff Stephens took on lateral assignments to enhance her skills and increase her competitiveness. For example, as a collateral duty, she became the logistics lead for the Critical Incident Management Group (CIMG) of the Transportation Security Administration.

182. The CIMG is responsible for responding to critical incidents and consists of different divisions from each TSA office. As the logistics lead, Plaintiff Stephens worked closely with the incident managers to handle logistics, coordinate operations, and provide support for affected

areas.

183. Plaintiff Stephens received numerous accolades for her work during Hurricanes Harvey, Irma, and Maria, as well as during the recent national emergency response to COVID-19, which involved managing logistics in over 400 airports and 25 field offices nationwide.

184. Between February of 2014 and December of 2022, Plaintiff Stephens applied for 24 K Band positions. She made the best qualified list in seven of them but was passed over in each case.

185. On March 21, 2022, Plaintiff Stephens contacted an EEO counselor about being denied for promotion in March of 2022, alleging individual race discrimination.

186. Plaintiff Stephens filed a Formal EEO Complaint on April 14, 2022.

187. Plaintiff Stephens filed a class claim via counsel on or about July 29, 2022. She wrote and expressed an intent to amend to add a class claim to her existing EEOC charge, alleging a pattern and practice of racial discrimination in FAMS' promotional practices on behalf of herself and a class of African American FAMS employees.

188. On or about September 26, 2023, her individual claims of race discrimination in being denied for promotion in March of 2022 was fully exhausted.

189. As referenced herein, Plaintiff Stephens' class claims were not consolidated with Plaintiff Sutton's EEO Class Complaint.

190. When Plaintiffs Parks, Sutton and Jordan received notice that their individual claims were released from being held in abeyance, Defendant took no action on their class claims, and, accordingly, no Final Agency Decision was rendered on Plaintiff Stephens' class claims.

191. Because Plaintiffs filed their initial complaint more than 180 days from the date Plaintiff Stephens filed her class claims, her class claims of race discrimination are timely. *Id.* at ¶ 63.

### c. <u>FACTS RELEVANT TO PLAINTIFF FREEMAN JORDAN</u>

192. Plaintiff Jordan began his career with FAMS in November of 2001 in the Detroit Field

office, after serving 10 years in Army Special Forces and 8 years as a Michigan State Trooper.

193. Plaintiff Jordan simultaneously served as the Operations Officer, Acting Supervisory Federal Air Marshal, and Training Officer for 6 months.

194. Plaintiff Jordan was responsible for establishing the Detroit Field Office training program and provided major assistance to the development of FAMS' Training Academy.

195. Plaintiff Jordan was responsible for establishing two FAMS national policies that are currently mandatory for all FAMS field offices, equipment inspection prior to foreign deployment (2002) and the "Safe Arrival Program" (2004) that requires all FAMS agents to check-in when deployed.

196. In 2010, Plaintiff Jordan helped create FAMS' Final Honors policies, that guides SAC decision making of Line of Duty Deaths.

197. In 2012 Plaintiff Jordan was reassigned to South Carolina and began receiving accolades for establishing statewide airport policies and procedures as the Assistant Federal Security Director for Law Enforcement (AFSD-LE), as well as establishing effective relationships with local, state, and federal law enforcement in South Carolina.

198. He was promoted to Assistant SAC in the Chicago Office in 2015, and remained in that role until he retired in 2022.

199. Plaintiff Jordan oversaw and ran the Chicago Operations Section from 2015 to 2020, receiving numerous accolades and providing guidance to six other larger FAMS field offices nationwide.

200. As Acting SAC, Plaintiff Jordan was flown to Washington, DC to receive awards for Leadership of Chicago Field Office of the Year.

201. While serving the Chicago Field Office, Plaintiff Jordan also received: (1) the FAM of the Year award for being the best performing FAM; (2) an Innovation award for Best Operations

Section in the agency; and (3) the Core Values award for the most honorable, dedicated and committed FAM.

202. TSA and FAMS recognized 34 Chicago FAMS agents under Plaintiff Jordan's leadership for exemplary performance in 2019.

203. Plaintiff Jordan saw the promotion of five FAMS agents to SFAM under his direct supervision in 2019.

204. Between 2017 and 2022, Plaintiff Jordan applied to seven Transportation Security Executive Services (TSES), and made the Best Qualified list of all but one position including: (1) a 2018 Chicago SAC position (Ronald Phifer selected) - Plaintiff Jordan not interviewed; (2) a 2019 FAMS Deputy Director position (Michael Ondocin selected) - Plaintiff Jordan not interviewed; (3) a 2019 Atlanta SAC position (Terrell Stevenson selected); (4) a 2020 FAMS Director position, (Michael Ondocin selected) - Plaintiff Jordan not interviewed; (5) a 2021 FAMS Deputy Director position, (Lowell Dimmoff selected) - Plaintiff Jordan not interviewed; (6) a 2021 FAMS Deputy Director position (Tirrell Stevenson selected) - Plaintiff Jordan not interviewed; and (7) a 2021 Chicago SAC (TSES) position (Mr. Duerr selected) - Plaintiff Jordan not interviewed.

205. Plaintiff Jordan was passed over for each position, despite being far more experienced and qualified than the white applicants who got the positions in question.

206. By way of example, despite being repeatedly recognized for his high level of performance as an ASAC and Acting SAC of the Chicago field office, Plaintiff Jordan was denied an interview on two separate occasions (2018 and 2022) for the Chicago SAC position – the very position in which he had successfully been working. Plaintiff Jordan made the best qualified list for FAMS Director, FAMS Deputy Director, and five other TSES positions, but was denied an opportunity to interview for the Chicago SAC position. Chicago SAC promotions were ultimately awarded to

less qualified white males on two separate occasions.

207. On or about July 15, 2022, Plaintiff Jordan contacted an EEO counselor about a June 9, 2022 denial of his application for promotion as the SAC for the Chicago Field Office caused by race discrimination and retaliation for engaging in prior EEO activity.

208. On or about July 22, 2022, Plaintiff Jordan met with an EEO counselor and asserted that the June 9, 2022 denial of his application for promotion as the SAC for the Chicago Field Office was due to a pattern and practice, and custom of racial discrimination against Black FAMS employees. The case number assigned was HS-TSA-02510-2022.

209. On August 4, 2022, Daniel Ricketts, EEO Specialist Civil Rights Division, EEO Branch, Complaints Section, TSA, sent an email with a DocuSign Notice to access documents related to HS-TSA-02510-2022. *See* Exhibit 5, Decl. of Pam Keith at ¶ 15; Exhibit 6, Decl. of Jeff Schrameck at ¶ 3; Exhibit 7, Decl. of Freeman Jordan at ¶ 3.

210. Ms. Keith, Mr. Schrameck and Plaintiff Jordan could not access the documents through the DocuSign link, and accordingly, asked for the documents to be sent by other means. Exhibit 5, Decl. of Pam Keith at ¶ 16; Exhibit 6, Decl. of Jeff Schrameck at ¶¶ 3-4; Exhibit 7, Decl. of Freeman Jordan at ¶ 4.

211. Ms. Keith, Mr. Schrameck and Plaintiff Jordan received an email from the DocuSign NA3 System on August 8, 2022, which attached the documents that were previously inaccessible (the Notice of Right to File a Formal Complaint, DHS Form 3090, and Summary). Exhibit 5, Decl. of Pam Keith at ¶ 17; Exhibit 6, Decl. of Jeff Schrameck at ¶¶ 5-6; Exhibit 7, Decl. of Freeman Jordan at ¶¶ 5-6.

212. On August 23, 2022, 15 days from the receipt of the Notice of Right to File a Formal Complaint and Summary, Plaintiff Jordan filed an internal EEO complaint alleging race discrimination in promotion practices. Accordingly, his EEO Complaint under case number HS-

TSA-02510-2022 was timely. Exhibit 5, Decl. of Pam Keith at ¶ 18; Exhibit 6, Decl. of Jeff Schrameck at ¶ 7; Exhibit 7, Decl. of Freeman Jordan at ¶¶ 7-9.

213. Plaintiff Jordan's EEO complaint alleged discrimination against him, and against the class of African American FAMS agents seeking promotion to K Band and TSES positions.

214. TSA accepted Plaintiff Jordan's EEO Complaint and investigated the claims raised in HS-TSA-02510-2022. TSA never raised an issue of timeliness or rejected the filing of the EEO Complaint by Plaintiff Jordan. Exhibit 5, Decl. of Pam Keith at ¶ 20; Exhibit 6, Decl. of Jeff Schrameck at ¶ 8; Exhibit 7, Decl. of Freeman Jordan at ¶ 8.

215. Plaintiff Jordan's individual claims of race discrimination and retaliation in being denied promotion as the SAC for the Chicago Field Office is fully exhausted.

216. As referenced herein, Plaintiff Jordan's class claims were not consolidated with Plaintiff Sutton's EEO Class Complaint.

217. When Plaintiffs Parks, Sutton and Jordan received notice that their individual claims were released from being held in abeyance, Defendant took no action on their class claims, and, accordingly, no Final Agency Decision was rendered on Plaintiff Jordan's class claims.

218. Because Plaintiffs filed their initial complaint more than 180 days from the date Plaintiff Jordan filed his class claims, his class claims of race discrimination are timely. Exhibit 5, Decl. of Pam Keith at ¶ 63.

**d. <u>FACTS RELEVANT TO PLAINTIFF CHAD SUTTON</u>**

219. Plaintiff Sutton began his law enforcement career as a Detective with the United States Capitol Police Department in Washington, D.C. in 1988. He served in that role until 2002.

220. Plaintiff Sutton began working with TSA as an Air Marshal assigned to the New York Field Office in July of 2002.

221. He transferred to the Washington, D.C. Field Office in September 2002, where he flew on

numerous domestic and international missions, while serving as the first acting Assistant Federal Security Director at BWI airport from June 2003 to January 2004.

222. From December 2004 to July 2006, Plaintiff Sutton worked as the acting Supervisory Federal Air Marshal assigned to FAM Headquarters Liaison Division, where he launched the FAM Law Enforcement Section (LES) responsible for TSA regulatory policies for armed law enforcement officers (LEOs) traveling throughout the country, making FAM LES the conduit for all armed law enforcement travel on commercial aircraft.

223. In July 2006, Plaintiff Sutton accepted the position of Washington Field Office (WFO) Supervisory Federal Air Marshal where he managed a diverse workforce consisting of thirty-eight FAMS agents that protected two major metropolitan airports.

224. He organized and coordinated FAM scheduling logistics, mentored/evaluated subordinate performance, developed hiring procedures for field assignments, and coached FAMS agents in the performance of their duties.

225. In late September 2008, Plaintiff Sutton accepted the position of Supervisory Federal Air Marshal at FAMS' Mission Operations Center where he again managed FAMS' logistical activities and mission assignments nationwide, to include crisis management incidents, and strategic responses to severe weather events.

226. In March 2009, Plaintiff Sutton accepted the position of Assistant Supervisory Federal Air Marshal in Charge, at the Transportation Security Operation Center, where he simultaneously supervised four divisions within FAMS and was responsible for organizing law enforcement and investigative responses to domestic and international transportation incidents.

227. In November of 2012, he returned to WFO as a Supervisory Federal Air Marshal overseeing FAMS' mission assignments, while coaching and mentoring FAMS agents for career progression.

228. In April 2015, Plaintiff Sutton accepted the position of Assistant Federal Security Director of Law Enforcement (AFSD-LE) at Reagan National Airport responsible for liaison with federal, state, and local law enforcement within the National Capitol Region.

229. In addition, he was the liaison for TSA and DHS leadership involving aviation security incidents. He was the first AFSD-LE to create an Airport Law Enforcement Taskforce consisting of both federal, state, and local agencies in the Capital Region, and the first in the United States to conduct a live unmanned aircraft system exercise at a major airport in support of 20 government agencies.

230. In August of 2020, Plaintiff Sutton was asked to manage WFO FAM personnel, which led to his new position in January of 2021 as supervisor within the FAMS' Threat Mitigation Section / Counter Terrorism Division (FTMS-CTD).

231. As the FTMS-CTD supervisor, Plaintiff Sutton was responsible for supporting the International Terrorism Operation Section, headed by the FBI and CIA. The International Terrorism Operation Section is responsible for covering domestic and international investigations into terrorist acts committed against the United States.

232. From the beginning of 2015 through 2016, Plaintiff Sutton applied to approximately 16 separate K Band promotional postings for which he was eminently qualified.

233. Despite his extensive experience, and the many times TSA asked Plaintiff Sutton to take on additional management responsibilities and leadership tasks, Plaintiff Sutton was passed over for every position.

234. In each case, although Plaintiff Sutton made the list of most qualified, he was passed over for people who were less qualified than he was, all of whom were white.

235. In 2019, Plaintiff Sutton applied for an additional three (3) K Band positions for which he was qualified, and again was passed over.

236. He filed an internal EEO complaint about being passed over for those 3 positions.

237. In 2020, he applied for two additional K Band positions, and in November of 2021 he applied for another K Band position for which he was qualified, and was again passed over for all three vacancies.

238. In December of 2021, Plaintiff Sutton was notified by email that he satisfied the qualifications for the position of Assistant Supervisory Air Marshall in Charge position in FAMS' Las Vegas Field Office. He applied for the position, which would have been a promotion, that same month.

239. On January 27, 2022, he received an agency-wide email announcing that a white FAMS employee with less time as a supervisor and less operational experience than Plaintiff Sutton was awarded the position. Plaintiff Sutton was not even provided the opportunity to interview for the position.

240. On or about February 6, 2022, Plaintiff Sutton contacted an EEO counselor about the denial of his application for promotion as an Assistant Supervisory Federal Air Marshal in Charge (ASAC). The case number assigned was HS-TSA-01044-2022.

241. Plaintiff Sutton filed a formal EEO complaint dated March 16, 2022, alleging race and color discrimination and retaliation for engaging in prior EEO activity.

242. Later, Plaintiff Sutton wished to amend his individual EEO complaint to include a class claim, but was first required to seek EEO counseling. Exhibit 5, Decl. of Pam Keith at ¶¶ 6-7.

243. Accordingly, on July 22, 2022, Plaintiff Sutton sent an email to the EEO Counselor, Danella Piper, in an attempt to obtain EEO counseling for his class claim, with the ultimate goal of adding a class claim to his pending EEOC Complaint. *Id.* at ¶ 8. Plaintiff Sutton's email contained the full extent of his class allegations and consisted of three sentences; it was not a formal EEO class complaint. *Id.* at 9. The email asserted that Defendant maintained a pattern and practice of

overlooking African American applicants, and that he sought to pursue his claim on behalf of himself and all similarly situated African Americans.

244. EEOC Regulation 29 CFR § 1614.204(d)(1) states that:

> Within 30 days of an agency's receipt of a [class] complaint, the agency shall: Designate an agency representative who shall not be any of the individuals referenced in §1614.102(b)(3) and forward the complaint, along with a copy of the Counselor's report and any other information pertaining to timeliness or other relevant circumstances related to the complaint, to the Commission. The Commission shall assign the complaint to an administrative judge or complaints examiner with a proper security clearance when necessary. The administrative judge may require the complainant or agency to submit additional information relevant to the complaint.

245. Despite the fact that Plaintiff Sutton submitted only an email to initiate EEO counseling on his class claim, and never filed a Formal EEO Class Complaint, Plaintiff Sutton's class claim was assigned to Administrative Judge Montez Sterling Cobb. *Id.* at ¶¶ 11-12.

246. On or about November 3, 2022, AJ Cobb issued a Request for Information regarding Plaintiff Sutton's class claim, now referred to as an EEO Class Complaint although nothing more than Plaintiff Sutton's three sentence email was before the AJ. *Id.* at ¶ 30. The Request for Information made no reference to a class claim of any other class representative plaintiff, and no other class claims were consolidated with Plaintiff Sutton's class claim. *Id.* at ¶ 31.

247. On or about May 18, 2023, AJ Cobb issued his Decision and Order Denying Class Certification.

248. On June 27, 2023, the Department of Homeland Security's Office of Civil Rights and Civil Liberties (CRCL) issued its Final Order on Plaintiff Sutton's class claims, fully implementing the AJ's decision.

249. Following the dismissal of Plaintiff Sutton's class claim, on or about August 23, 2023 DHS CRCL issued its final agency decision on his individual claims, case number HS-TSA-01044-

2022.

250. On August 29, 2023, Counsel and Plaintiff Sutton received the password from Mechelle White, Equal Employment Opportunity Specialist, Civil Rights and Civil Liberties, DHS to enable review of the final agency decision. Exhibit 5, Decl. of Pam Keith at ¶ 59; Exhibit 6, Decl. of Jeff Schrameck at ¶¶ 10-13; Exhibit 8, Decl. of Chad Sutton at ¶ 4.

251. However, despite receiving the password, they continued to be unable to access the documents. Exhibit 5, Decl. of Pam Keith at ¶ 60; Exhibit 6, Decl. of Jeff Schrameck at ¶ 14; Exhibit 8, Decl. of Chad Sutton at ¶ 5.

252. Plaintiff Sutton called Mechelle White for assistance in accessing the documents. Exhibit 8, Decl. of Chad Sutton at ¶ 5.

253. On August 31, 2023, Plaintiff Sutton was able to access the documents with the password provided and he emailed the document with instructions to his counsel. Exhibit 5, Decl. of Pam Keith at ¶ 61; Exhibit 6, Decl. of Jeff Schrameck at ¶ 15; Exhibit 8, Decl. of Chad Sutton at ¶ 6.

254. On August 31, 2023, after accessing the document Chad Sutton emailed Mechelle White notifying her that the Final Agency decision was received. Exhibit 6, Decl. of Jeff Schrameck at ¶ 16; Exhibit 8, Decl. of Chad Sutton at ¶ 7.

255. The initial complaint in this action was filed on November 29, 2023, within ninety days after receipt and access to the Final Agency Decision in case number HS-TSA-01044-2022. Exhibit 5, Decl. of Pam Keith at ¶ 64.

## V. CLASS ACTION ALLEGATIONS

256. The foregoing paragraphs are incorporated as though set forth at length herein.

257. Plaintiffs Parks, Stephens and Jordan [Named Plaintiffs] bring this action pursuant to Federal Rules of Civil Procedure 23 on behalf of the following Class:

> All current and former African American Transportation Security Administration employees, who are part of the Federal Air Marshals Service, who have been denied, or will be denied in the future, the opportunity for promotion K Band or TSES positions as a result of Defendant's promulgation and enforcement of its promotion policies and procedures applied to these positions.

258. This action is properly maintainable as a class action under Rule 23(a) because: (a) upon information and belief, the Class includes more than 100 former and current African American FAMS agents, which makes the class so numerous that joinder of all its members is impracticable; (b) the claims alleged on behalf of the Class raise questions of law or fact common to the class; (c) the claims of the Named Plaintiffs are typical of the claims of the class; and (d) the Named Plaintiffs and class counsel will adequately and fairly protect the interests of the class.

259. Common questions of law and fact exist as to all members of the Class and these common questions predominate over questions affecting only individual members.

260. The questions of law and fact common to the Class include but are not limited to the following:

a. Whether the promotion policy and procedures have a disparate effect on African Americans;

b. Whether the promotion policy and procedures discriminate against the Class in violation of Title VII of the Civil Rights Act of 1964, as amended;

c. Whether the Named Plaintiffs and the Class are entitled to equitable and/or injunctive relief as a result of the harm caused by Defendant's uniform employment policies and practices, and if so, the nature of such relief; and

d. Whether the Named Plaintiffs and the Class are entitled to monetary damages and, if so, the nature and amount of such damages.

261. The Named Plaintiffs are members of the Class, and their claims are typical of the claims

of the members of the Class.

262. The Named Plaintiffs will fairly and adequately represent the Class. The Named Plaintiffs have no conflict with any other class member and desire to represent the Class.

263. The Named Plaintiffs have retained counsel who are both competent and experienced in both employment and class action litigation, and specifically, litigating class action discrimination claims.

264. Class certification is appropriate under Federal Rules of Civil Procedure 23(b)(1)(A), (b)(1)(B) and (b)(2) because adjudications with respect to individual members of the Class would create a risk of inconsistent or varying adjudications or incompatible standards of conduct, would as a practical matter be dispositive of the interests of other non-party members, and because Defendant has acted on grounds generally applicable to the Class, making class-wide declaratory, injunctive, and other equitable relief appropriate.

265. If necessary, class certification would also be appropriate under Federal Rule of Civil Procedure 23(b)(3) because common issues of law and fact predominate over any individual issues; because a class action is superior to other methods for the fair and efficient adjudication of the controversy; because joinder of all members is impractical; because the burden and expense of individual litigation make it impractical for members of the Class to pursue individual litigation in order to vindicate their rights; and because the Named Plaintiffs are not aware of any problems that would militate against the maintenance of this action as a class action.

266. Defendant has a policy and practice of treating African American FAMS agents less favorably than white FAMS agents in connection with their promotion process. Defendant's racially discriminatory behavior against Plaintiffs described herein is representative of a policy and practice of race-based discrimination in the promotion process, which Defendant created, maintained, and continues to maintain that has the intent and effect of discrimination against

African American FAMS agents. These policies and practices affect class members comprised of all former and current African American FAMS agents and constitute illegal race-based class-wide discrimination.

## VI. INJURY TO PLAINTIFFS AND THE CLASS

267. The Named Plaintiffs and the Class they represent have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and the injunctive relief sought in this action is the only means of securing complete and adequate relief. The Named Plaintiffs and the Class they represent are now suffering and will continue to suffer irreparable injury from Defendant's discriminatory acts and omissions.

268. Defendant's actions have caused and continue to cause the Named Plaintiffs and the Class they represent financial losses in an amount to be determined according to proof, including but not limited to lost wages and retirement earnings, out-of-pocket costs, and other lost employment benefits and opportunities.

269. The Named Plaintiffs and the Class they represent have suffered emotional distress, humiliation and embarrassment, in a value to be determined according to proof. Such emotional distress has been manifested in a variety of ways including, but not limited to, psychological trauma and physical symptoms to be proven at trial.

## CLASS CLAIMS FOR RELIEF

### COUNT I

**Race Discrimination, Failure to Promote under 42 U.S.C. § 2000e, et seq.**
**(Disparate Impact)**

270. Paragraphs 1 through 269 are realleged and incorporated herein by reference.

271. This claim is brought on behalf of the Named Plaintiffs and the Class.

272. Defendant's conduct constitutes disparate impact on the basis of race in violation of Title

VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended, by the Civil Rights Act of 1991, 42 U.S.C. § 1981(a).

273. Paragraphs 1 though 269 further demonstrate that Defendant has maintained a system with respect to competitive promotions to K Band and TSES that has an adverse disparate impact on African American FAMS agents. This system is not and cannot be justified by business necessity, but even if it could be so justified, less discriminatory alternatives exist that could equally serve any alleged necessity.

274. Each and all of the Named Plaintiffs and the Class have been injured by the disparate impact discrimination that they have encountered.

275. On behalf of themselves and the Class, the Named Plaintiffs request relief as provided in the Prayer for Relief below.

**COUNT II**

**Race Discrimination, Failure to Promote under 42 U.S.C. § 2000e, et seq.**
**(Disparate Treatment)**

276. Paragraphs 1 through 269 are realleged and incorporated herein by reference.

277. This claim is brought on behalf of all Named Plaintiffs and the Class.

278. Defendant's conduct constitutes disparate treatment on the basis of race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended, by the Civil Rights Act of 1991, 42 U.S.C. § 1981(a).

279. Paragraphs 1 though 269further demonstrate that Defendant has maintained a pattern and practice of race discrimination with respect to competitive promotions to K Band and TSES positions. Race discrimination has become the standard operating procedure of Defendant with respect to promotions to senior level positions.

280. Each and all of the Named Plaintiffs and the Class have been injured by the disparate treatment discrimination that they have encountered.

281. On behalf of themselves and the Class, the Named Plaintiffs request relief as provided in the Prayer for Relief below.

## CLAIMS ON BEHALF OF CHAD SUTTON

## COUNT III

**Race Discrimination, Failure to Promote under 42 U.S.C. § 2000e, et seq.**
**(Disparate Treatment)**

282. Paragraphs 1 through 269 are realleged and incorporated herein by reference.

283. This individual claim of race discrimination is brought on behalf of Plaintiff Chad Sutton.

284. Defendant's conduct constitutes disparate treatment on the basis of race and color in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended, by the Civil Rights Act of 1991, 42 U.S.C. § 1981(a).

285. Plaintiff Sutton was eminently qualified for the promotion to Assistant Supervisory Air Marshall in Charge position in FAMS' Las Vegas Field Office, and more qualified that the white FAMS employee who was selected, but because of his race, he was not even selected for an interview.

286. Statistical information for the supervisory staff within the Las Vegas Field Office, where Plaintiff Sutton applied for the Assistant Supervisory Air Marshall in Charge position, consists of all white employees.

287. Paragraphs 1 though 269 further demonstrate that Defendant has maintained a pattern and practice of race discrimination with respect to competitive promotions to K Band and TSES positions. Race discrimination has become the standard operating procedure of Defendant with respect to promotions to senior level positions.

288. As a direct and proximate cause of the race-based discrimination he suffered, Plaintiff Sutton is entitled to compensatory damages of not less than $300,000.00, plus costs, fees, interest,

attorneys' fees, and all other remedies deemed appropriate by the Court.

**COUNT IV**

**Violation of 42 U.S.C. § 2000e, et seq.**
**(Retaliation)**

289. Paragraphs 1 through 269 are realleged and incorporated herein by reference.

290. This claim is brought on behalf of Plaintiff Sutton.

291. Plaintiff Sutton previously questioned Defendant's hiring and promotion practices through prior EEO Complaints alleging racial discrimination. In filing previous EEO Complaints, Plaintiff Sutton engaged in protected activity.

292. Because Plaintiff Sutton engage in protected activity, Defendant targeted him for adverse employment actions, including denying him an interview for the Assistant Supervisory Air Marshall in Charge position in FAMS' Las Vegas Field Office and denying him the promotion to that position.

293. Plaintiff Sutton asserts that Defendant targeted him for retaliatory action because he accused his superiors and FAMS' leadership of race discrimination.

294. As a direct and proximate cause of this retaliatory action, Plaintiff Sutton is entitled to compensatory damages of not less than $300,000.00, plus costs, fees, interest, attorneys' fees, and all other remedies deemed appropriate by the Court.

**PRAYER FOR RELIEF**

295. Therefore, Plaintiffs pray that the following relief be granted to them and to those whom they represent:

(a) Certify the case as a class action on behalf of the proposed Plaintiff class and designate Named Plaintiffs as representatives of the Class and their counsel of record as Class Counsel;

(b) Enter a declaratory judgment that Defendant's conduct as alleged herein has violated Plaintiffs' civil rights and the civil rights of FAMS' African American agents under 42 U.S.C. § 2000e and 42 U.S.C. § 1981a;

(c) Enter a permanent injunction barring Defendant from continuing to engage in the illegal and discriminatory conduct alleged herein;

(d) Enter a permanent injunction directing Defendant to take affirmative steps to

remedy the effects, and prevent future occurrences, of the illegally discriminatory conduct alleged herein;

(e) Award compensatory damages according to proof for each Plaintiff and each class member as would compensate fully each Plaintiff and class member for their emotional distress, embarrassment, humiliation, deprivation of their right to equal employment opportunity regardless of race and other harms alleged herein;

(f) Award all financial damages that Plaintiffs and the Class have sustained as a result of Defendant's conduct, including but not limited to back pay, front pay, retirement payments, out-of-pocket expenses and general and specific damages for lost compensation and job benefits that they would have received but for the discriminatory practices of Defendant;

(g) Award reasonable attorneys' fees incurred in this action and the administrative claims that preceded it, expert fees, and costs;

(h) Award pre-judgment and post-judgment interest, as provided by law; and

(i) Order other such relief as the Court deems just and proper.

Dated: April 3, 2026

Respectfully submitted,

/s/ Thomas J. Curcio
Thomas J. Curcio (VSB #23016)
CURCIO LAW
700 North Fairfax Street, Suite 505
Alexandria, Virginia 22314
Telephone: (703) 836-3366
Facsimile: (703) 836-3360
Email: tcurcio@curciolaw.com

*Attorneys for Plaintiffs and the Class*

**DEMAND FOR A JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), the Plaintiffs demand a trial by jury of all issues so triable as of right.

Respectfully submitted,

/s/ Thomas J. Curcio

Thomas J. Curcio (VSB #23016)
CURCIO LAW
700 North Fairfax Street, Suite 505
Alexandria, Virginia 22314
Telephone: (703) 836-3366
Facsimile: (703) 836-3360
Email: tcurcio@curciolaw.com

*Attorneys for Plaintiffs and the Class*

Dated: April 3, 2026